## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **FELICIA Y. DANIELS,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **Case No.:  2:07-CV-1831-VEH** |
| | ] | |
| **MIKE HALE, in his official** | ] | |
| **capacity as Sheriff of Jefferson** | ] | |
| **County,** | ] | |
| | ] | |
| **Defendant.** | ] | |

## MEMORANDUM OPINION

## I.   INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff Felicia Daniels ("Daniels") initiated this case job discrimination case on October 9, 2007.  (Doc. 1).  She originally sued the Jefferson County Sheriff's Department (the "Sheriff's Department") for discriminatory discharge on the basis of race (count I) and retaliation (count II) under both Title VII and § 1981.  (*See generally id.*).

Subsequently, on December 10, 2007, the court dismissed the Sheriff's Department (on Defendant's motion (*see* Doc. 4)) as an improper party and gave Daniels leave to file her proposed new complaint naming Defendant Mike Hale ("Hale"), in his capacity as Sheriff of Jefferson County, as the appropriate party in interest.  (Doc. 8).  Daniels then filed her first amended complaint (Doc. 9) on

December 11, 2007.

On April 1, 2008, Daniels sought again to amend her complaint to include allegations of retaliation under the Family and Medical Leave Act of 1993 ("FMLA" or the "Act"). (Doc. 13). The court granted Daniels's additional amendment request (*see* Doc. 16), and on May 22, 2008, Daniels filed her second amended complaint. (Doc. 20).

Hale then filed a Motion to Dismiss Second Amended Complaint (Doc. 22) on June 2, 2008. On this particular motion, the court granted a dismissal of any claim for monetary damages on Eleventh Amendment immunity grounds under both under § 1981 and the FMLA, but otherwise denied the motion, leaving in the litigation any potential claim for injunctive relief under the Act. (Doc. 26).

The court now has before it two Motions for Summary Judgment (Docs. 31, 39) filed by Hale on September 16, 2008, and October 30, 2008, respectively, which assert separate and independent bases for why he is entitled to judgment as a matter of law. The first Motion for Summary Judgment maintains that the doctrine of judicial estoppel procedurally bars Daniels's claims; the second Motion for Summary Judgment is merits-based. Both motions are under submission (*see* Docs. 32, 35, 37, 40-43) and, as discussed more fully below, the court concludes that summary judgment pursuant to the procedural motion is due to be granted in part and denied

2

in part; summary judgment pursuant to the merits-based one is due to be granted in full.

## II.    STANDARD ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R .Civ. P. 56. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citation omitted). "The substantive law applicable to the case determines which facts are material." *Fitzpatrick*, 2 F.3d at 1115 (citation omitted). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination or retaliation case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 134 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450

3

U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).[1]

Under the *McDonnell Douglas/Burdine* framework, a plaintiff first has the burden of proving by a preponderance of the evidence a *prima facie* case of discrimination or retaliation. Once the plaintiff proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. Finally, if the defendant carries its burden, the plaintiff must <u>either</u> prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for the illegal conduct <u>or</u> present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination or retaliation was a "motivating factor" for the employment action, <u>even though defendant's legitimate reason may also be true or have played some role in the decision</u>. *McDonnell Douglas*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02. The court is aware that the summary judgment rule applies in job discrimination cases just as in other cases. *Chapman v. AI Transport*, 229 F.3d 1012, 1025 (11th Cir. 2000) (rejecting an earlier, contrary

---

[1] Daniels argues only that she has established a circumstantial evidence case of race discrimination and retaliation. (*See* Doc. 42 at 16, 26 (suggesting application of circumstantial evidence model to both types of claims)).

general rule and emphasizing that no thumb is to be placed on either side of the scale).

## III.   STATEMENT OF FACTS[2]

### A.   Procedural Motion for Summary Judgment

#### 1.   Daniels's 2005 Bankruptcy Action

Daniels filed a petition for Chapter 13 bankruptcy protection in this district's bankruptcy court on June 30, 2005 ("2005 Bankruptcy Action").  AF No. 1.[3]  On

---

[2]   Whenever the facts are in dispute, they are stated in the manner most favorable to the non-moving party.  *See Fitzpatrick*, 2 F.3d at 1115.  Therefore, these are the facts for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

Also, because of the voluminous number of facts asserted by the parties as a result of two pending dispositive motions and related briefing, the court has endeavored to limit its recitation to those facts it finds to be necessary to its decision on summary judgment.  Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

[3]   The designation "AF" stands for admitted fact and indicates a fact offered by Hale that Daniels has admitted in her written submissions on summary judgment, in her deposition testimony, or by virtue of any other evidence offered in support of her case.  Whenever Daniels has adequately disputed a fact offered by Hale, the court has accepted her version.  The court's numbering of admitted facts (*e.g.*, AF No. 1) in this procedural motion section corresponds to the numbering of Hale's statement of facts as set forth in Doc. 32 and responded to by Daniels in Doc. 35.  A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (AF No. 6.2) would indicate the second sentence of paragraph 6 of Hale's statement of facts is the subject of the court's citation to the record.

March 28, 2006, Daniels filed a charge of discrimination against Hale with the United States Equal Employment Opportunity Commission ("EEOC") alleging race discrimination and retaliation under Title VII of the 1964 Civil Rights Act.  AF No. 2.  Daniels failed to disclose the EEOC claim in her 2005 Bankruptcy Action.  AF No. 3. Due to Daniels's continuing default under the terms of the approved confirmation plan,  the 2005 Bankruptcy Action was dismissed on October 10, 2006, and terminated on February 2, 2007.  AF No. 4.

### 2.    Daniels's 2006 Bankruptcy Action

Twenty days following the dismissal of the 2005 Bankruptcy Action, on October 30, 2006, Daniels filed another petition for Chapter 13 bankruptcy protection in this district's bankruptcy court, a proceeding which is still pending ("2006 Bankruptcy Action").  AF No. 5.  The 2006 Bankruptcy Action was assigned to the same bankruptcy judge to whom the 2005 Bankruptcy Action had been assigned pursuant to a local administrative order and the Federal Rules of Bankruptcy Procedure.  AF No. 6.1.  The order/rules require this non-random judicial assignment when a petition is filed by the same debtor within twelve months of the dismissal of a prior filed action.  AF No. 6.2.

Daniels received a dismissal and notice of rights letter from the EEOC, dated July 11, 2007, containing a "no cause" determination on her charge of discrimination.

6

AF No. 8.  Daniels then filed her discrimination complaint in this court on October 9, 2007.  AF No. 9.

Daniels alleges in her complaint, inter alia, identical civil rights violations based on Title VII race discrimination/retaliation as those stated in her EEOC charge, and a subsequently added new claim under the FMLA (collectively hereinafter referred to as the "Federal Claims").  AF No. 11.  On February 2, 2007, the bankruptcy court issued an order in the 2006 Bankruptcy Action confirming the Chapter 13 plan signed on February 1, 2007.  AF No. 13; (Doc. 32 at Ex. D at 11 at Doc. 44).

As dated January 26, 2007, and filed on February 7, 2007, Daniels amended her schedules and Statement of Financial Affairs (the "Statement") in the 2006 Bankruptcy Action.  (Doc. 32 at Ex. D at 11 at Docs. 47-48, 50; Doc. 32 at Ex. F at 2).  The amended Statement indicates that Daniels has an unfiled, but "[p]otential claim against the Jefferson County Sheriff's Department regarding termination from her employment as a dispatcher.  Calvin D. Biggers ["Biggers"] is currently representing the Debtor in this matter."  (Doc. 32 at Ex. F at 2).

Under the amended Statement's "COURT OR AGENCY LOCATION" section, the entry indicates "not yet filed[.]"  ( *Id.* (emphasis by underlining added)).  Under the "STATUS OR DISPOSITION" portion, the document similarly states "not yet

filed[.]" (*Id.*).  Finally, under  the "CAPTION OF SUIT AND CASE NUMBER" subpart, the form also reads "not yet filed[.]"  (*Id.*).

Subsequently, on March 23, 2007, an application to approve Biggers as special counsel for Daniels was filed with the following description:  "Debtor was terminated by the Jefferson County Sheriff [sic] Department as dispatcher [and] appealed her termination.  Applicant will represent debtor in pending case in the Circuit Court of Jefferson County."  (Doc. 32 at Ex. G at 2 (emphasis in original)); AF 15.1; AF 15.2. Attached to the application is the related retainer agreement which similarly indicates that the nature of the matter is the "Pers Bd Appeal by Jeff Co Sheriffs Dept[.]"  (Doc. 32 at Ex. G at 5 (emphasis added)).  On April 26, 2007, the application for Biggers to serve as counsel for "a special purpose" was approved by the bankruptcy court. (Doc. 32 at Ex. H at 1); AF No. 16.

On May 7, 2007, the bankruptcy trustee, after receiving "a copy of a proposed settlement agreement in the action against Jefferson County[,]" filed a Motion to Alter or Amend Confirmation Order Entered on February 2, 2007, seeking modification of the confirmation order to provide "that any lawsuit proceeds b[e] paid to the Chapter 13 Trustee."  (Doc. 32 at Ex. I ¶¶ 8-9).  The bankruptcy trustee's motion was granted on June 21, 2007, stating that "any settlement or judgment award regarding the civil cause of action against Jefferson County recovered by the Debtor

8

shall be paid to the Chapter 13 Standing Trustee and distributed through the chapter 13 case for the benefit of creditors." (Doc. 32 at Ex. J (emphasis added)); AF No. 18. On August 13, 2008, Daniels filed a Motion to Suspend Payments in the 2006 Bankruptcy Action due to the stated reason that she was no longer being employed. AF No. 19.

Daniels has never filed a separate or updated amended Statement relating to her EEOC charge or her Federal Claims in the 2006 Bankruptcy Action. Also (and in contrast to Biggers's filing in bankruptcy court), the CM/ECF docket sheet regarding the 2006 Bankruptcy Action that has been made a part of this record does not report any application on the part of Daniels's attorney in this case to serve as special counsel with respect to her Federal Claims. (*See generally* Doc. 32 at Ex. D at 6-14). The 2006 Bankruptcy Action is currently ongoing.

### B.    Merits-Based Motion for Summary Judgment

Daniels was employed by the Jefferson County Department of Health (the "JCDH") from December 31, 1996, until December 31, 2004. AF No. 1.[4]  Daniels

---

[4] The designation "AF" stands for admitted fact and indicates a fact offered by Hale that Daniels has admitted in her written submissions on summary judgment, in her deposition testimony, or by virtue of any other evidence offered in support of her case. Whenever Daniels has adequately disputed a fact offered by Hale, the court has accepted her version. The court's numbering of admitted facts (*e.g.*, AF No. 1) in this merits-based motion section corresponds to the numbering of Hale's statement of facts as set forth in Doc. 40 and responded to by Daniels in Doc. 42. A number

commenced her employment as a Public Safety Dispatcher II ("PSD II" or dispatcher) with the Sheriff's Department on January 4, 2005.  AF No. 2.

A PSD II must be able to timely and effectively gather information, must be assertive, must have good verbal communication skills, must enunciate and speak clearly so that the public and the deputy sheriffs can understand the information being conveyed, and must be aggressive and maintain control of the situation.  AF No. 3.1. A PSD II that cannot effectively convey information puts lives at risk.  AF No. 3.2.

A PSD II plays a key role in law enforcement (Ex. B at 12; Ex. C at 88), and is a mission critical job.  AF No. 4.  There are three main job functions for the position of PSD II:  call-taking, working the radio, and working the NCIC machine. AF No. 5.

All new PSD II hires are cross-trained so supervisors can cover all necessary stations.  AF No. 6.  Call-taking is the 911 caller's first point of contact with the Sheriff's Department and the initial point of information gathering, requiring accurate spelling.  AF No. 7.1.  Call-takers timely type the information into the Computer Aided Dispatch (CAD) system.  AF No. 7.2.  The input of incorrect and/or unclear

_____

following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (AF No. 3.2) would indicate the second sentence of paragraph 3 of Hale's statement of facts is the subject of the court's citation to the record.

information requires the dispatcher to ask the call-taker for clarification or to actually call the emergency caller back.  AF No. 7.3.

Working the radio means dispatching calls to the deputy sheriffs in the field and clearly communicating with the deputy sheriffs throughout the call.  AF No. 8.1. The dispatcher provides the deputy sheriff with the necessary and appropriate information to respond to the call.  AF No. 8.2.  Working the radio (dispatching) is the majority of the job as a PSD II.  AF No. 8.3.

At the NCIC station, data is entered regarding stolen property, missing persons, and warrants are validated.  AF No. 9.1.  The NCIC is detailed and intricate work and requires a certain level of reading comprehension from the operator.  AF No. 9.2.

Prior to the recent creation of the PSD III position, PSD IIs trained new PSD II hires.  AF No. 11.1.  PSD IIs trained Daniels.  AF No. 11.2.

Emma Moore ("Lt. Moore"), a black female, one of Daniels's supervisors, has been employed by the Sheriff since 1982 and has been a lieutenant assigned to the Communications Bureau since July, 2005.  AF No. 12.   Lt. John Carden ("Lt. Carden"), a white male, was employed with the Sheriff's Department from 1976 until June 30, 2006; his last day of work at the Sheriff's Department was October 1, 2005. AF No. 13.1.  Lt. Moore and Lt. Carden shared command of the Communications Bureau until Lt. Moore took full command on October 1, 2005.  AF No. 13.2.

11

Sgt. Sheila Garrett ("Sgt. Garrett") is a white female with 35 years tenure, 17 of which were as the Sergeant in the Radio Room.  AF No. 14.1.  Sgt. Garrett played an integral role in the operation of the Radio Room and was responsible for the training program for the new PSD II recruits.  AF No. 14.2.

Leo Taylor,  Jr. ("Taylor"), a black male (Ex. G at 45.), is currently a PSD III with the Sheriff's Department.  AF No. 15.1.  Prior to becoming a PSD III, Taylor was a PSD II.  AF No. 15.2.  Taylor was a trainer for PSD II hires.  AF No. 15.3.

In conducting training, Taylor noticed performance issues with Daniels, did not feel she was cut out to be a dispatcher, covered for her job inadequacies, and often took over her duties.  AF No. 15.4.  Taylor had to correct Daniels's call-taking and data entry errors including grammar to allow the calls to be answered and addressed smoothly by the deputy sheriff answering the call.  AF No. 15.5.  Taylor observed Daniels stammer and/or stutter at times, preventing her from conveying the necessary information.  AF No. 15.6.  In his opinion, Daniels was not comprehending the information she needed to be an effective PSD II.  AF No. 15.7.[5]

The Sheriff's Department utilizes PSD IIs in its radio room as opposed to PSD

---

[5] Daniels does not dispute the substance of Taylor's testimony as set out in paragraph 15, but in opposition notes that he was not a decision-maker.  (Doc. 42 at 1 ¶ 15).  Daniels later admits, however, that Taylor did provide input with respect to the decision-making process.  *See, e.g.*, AF Nos. 25.1, 39, 40.2, *infra*.

Is ,who require less knowledge and skills.  AF No. 16.1.  A PSD I is a call-taker only and does not work the radio.  AF No. 16.2.  Although there are examples of situations in which other PSD II employees were permitted to work on only one of the dispatch functions for extended periods of time, as a PSD II, Daniels could not work permanently as a call-taker only.  AF No. 16.3.

The PSD IIs receive hands-on, in-house instruction from Communication Training Officers or "CTOs."  AF No. 17.1.  The CTOs evaluate the PSD IIs' work and training and report results to the sergeant, who reports to the lieutenant, and then to the commanding officers.   AF No. 17.2. The first week of training is an introduction.  AF No. 17.3.  The PSD IIs then receive three weeks of training on the phones.  AF No. 17.4.  The training then moves to the radio and then to the NCIC function.  AF No. 17.5.

Subsequent to this training, the PSD IIs do "ride-alongs" (not a key component of training).  AF No. 17.6.  The PSD II is evaluated the last two weeks of training. AF No. 17.7.

In addition to in-house training, a forty-hour, non-mandatory review/update class is offered by the Alabama Public Communications Organization ("APCO").  AF No. 18.1.  Daniels was scheduled to attend the forty-hour APCO class in May 2005, but did not attend due to her tendered resignation with the stated intention of

13

returning to her prior, less demanding job at the JCDH.  AF No. 18.2.[6]

Sam Maske ("Maske") trained Daniels on the radio for at least one month.  AF No. 22.1.  He worked with Daniels for a couple of days at call-taking and trained her the same as all others.  AF No. 22.2.  Maske prepared daily observation reports.  AF No. 22.3.  The CTOs prepared daily observation reports and went over their observations with Daniels, who was provided a copy thereof.  AF No. 22.4. For inexplicable reasons, the location of all the daily observation reports relating to Daniels is not known and only a limited portion are contained in the record.  AF No. 22.5.[7]

Daniels was shy, quiet, and it was difficult for her to talk on the radio.  AF No. 23.1.  Maske had to correct Daniels's work at call-taking before the information was sent back to the dispatcher.  AF No. 23.2.  After weeks of training on the radio,

_____

[6] Daniels admits these facts set forth in paragraph 18, but also responds that she could have attended this APCO training because she was still employed with the Sheriff's Department at the time. (Doc. 42 at 1 ¶ 18).  She also notes that she requested on numerous times to attend additional training and was denied the opportunity.  (Doc. 42 at 1-2 ¶ 18).

[7] Daniels argues that because of the missing reports, the court should draw an inference that "the reports were harmful to the defendant for example that they showed that the plaintiff performed well during her training period or that the plaintiff's training was inadequate." (Doc. 42 at 2 n.1).  However, Daniels has not claimed spoliation on the part of Hale and regardless, offers no case authority, controlling or otherwise, that such an inference is appropriate to make in the context of an employment law case.

Maske felt that he was not getting through to Daniels.  AF No. 23.3.

Taylor told Sgt. Garrett that he did not think Daniels was capable of being a PSD II.  AF No. 25.1.  In Taylor's opinion, Daniels had problems with pronunciation and enunciation.  AF No. 25.2.  Daniels's speech was deficient and she was unable to adequately handle the call-taker function.  AF No. 25.3.

On April 28, 2005, Daniels was hard to understand on the radio in Bessemer which resulted in her being removed therefrom; however, Daniels was only told that she needed to speak up on the radio, not that she could not be understood.  AF No. 26; (Doc. 42 at 2-3 ¶ 26).  High-ranking personnel of the Sheriff's Department advised Sgt. Garrett that she was endangering lives by allowing Daniels to work on the radio and ordered her on numerous occasions to get Daniels off the radio.  AF No. 30.

Daniels's deficiencies affected the response time of deputy sheriffs.   AF No. 32.1. Other PSD IIs had to pick up Daniels's shifts.  AF No. 32.2.

Daniels received performance counseling for an incident that occurred on April 17, 2005, where Daniels was the call-taker and gave incorrect advice and then

incorrectly coded the call.  AF No. 33.[8]  Daniels talked to Lt. Carden, Sgt. Garrett, and Sgt. Thompson about her abilities and employment as a PSD II.  AF No. 34.

Subsequent to the incidents of April 17 and April 28, 2005, Daniels advised Sgt. Garrett that she wanted to return to the JCDH.  AF No. 35.  Daniels submitted her resignation to the Sheriff's Department on May 6, 2005, and filed her request for transfer on May 9, 2005.  AF No. 36.1.  Daniels's poor performance was discussed with her prior to submission of her resignation from the position of PSD II.  AF No. 36.2.

Daniels's request for a transfer was denied by the Personnel Board of Jefferson County (the "Personnel Board") on May 10, 2005.  AF No. 37.  On May 10, 2005, Daniels requested Hale to allow her to rescind her resignation, which he permitted solely as an accommodation to Daniels to allow her to retain her benefits while she looked for new employment.  AF No. 38.

Following discussions with Sgt. Garrett concerning Daniels's work deficiencies, Maske, Taylor, Georgia Alexander, Lt. Carden, and Lt. Moore all

---

[8] Daniels admits that she received performance counseling for this incident, but notes that Sgt. Garrett testified that "it wasn't her [*i.e.*, Daniels's] fault that the car didn't get dispatched.  It was the dispatcher who went in and changed it to a 76." (Doc. 42 at 4 ¶ 33; Doc. 40 at Ex. E at 41).  However, related to this testimony, Daniels has not pointed to any additional evidence that the relevant decision-makers agreed (or even were aware) at the time of Daniels's discharge that there was a potential mistake made with this counseling action against her.

reached the conclusion she could not overcome her deficiencies.  AF No. 39.  Lt.

Moore, Captain Parker and Chief Atkinson discussed Daniels's inabilities.  AF No.

40.1.  Lt. Moore discussed Daniels's issues with Taylor and Taylor told Lt. Moore

that Daniels could not make it as a PSD II.  AF No. 40.2.

Captain Parker instructed Lt. Moore to make a recommendation about

Daniels's continued employment, and Lt. Moore complied.  AF No. 41.  Following

extensive consultation between and among Chief Atkinson, Lt. Carden, and Captain

Parker, it was determined that there was no option other than to terminate Daniels's

employment.  AF No. 42.[9]

More specifically, Lt. Moore generated a memo to Captain Parker dated

October 25, 2005, recommending that Daniels be fired because she "has made no

effort to improve her deficiencies[;]" "only performs the duty of call taker and

continues to make errors when assigning codes to the calls[;]" "create[s] low morale

for the other staff members that are required to perform all the duties in the

Communications Bureau[;]" and "lower[s] the quality of job performance and

standards that are expected from our employees." (Doc. 41 at Ex. 4).  Internal Affairs

of the Sheriff's Department was not involved in Lt. Moore's recommendation that

---

[9] Daniels admits that this was the testimony, but challenges the determination and suggests that there were other viable options.  (Doc. 42 at 4 ¶ 42).  However, Daniels does not provide any citations to evidence supporting her assertion.

Daniels be terminated.  AF No. 43.

Daniels began her sick leave on October 12, 2005.  AF No. 44.1.  The decision to end Daniels's employment was made before she took leave in October, 2005, and before she notified the Sheriff's Department that she was taking leave.  AF No. 44.2.  The Sheriff's Department postponed Daniels's separation to enable her surgery to be covered by insurance.  AF No. 44.3.

On November 1, 2005, Daniels was discharged due to her inadequate work performance.  AF No. 45.1.  The termination was rescinded and Daniels was placed on administrative leave without pay until November 24, 2005, to allow her to seek other employment through the Personnel Board.  AF No. 45.2.  Daniels was officially fired on November 25, 2005.  AF No. 45.3.

At the same time that Daniels's employment was terminated, three other vacancies in the radio room needed to be filled and two of the three vacancies were filled—both with black females.  AF No. 46.1.  The third vacancy was carried over to another list of eligibles and was filled, in addition to two newly created vacancies, with one black female, one black male, and one white female.  AF No. 46.2.

At first, Dan Peoples ("Peoples"), a white employee, was slower than other PSD IIs at inputting information, but Peoples was capable of adequately performing the tasks of a PSD II.  AF No. 48.1.  Peoples gradually improved his skills through

his own initiative and increased his speed, resulting in his becoming a capable PSD II.  AF No. 48.2.  Peoples also attended the forty-hour APCO dispatcher training program during his probationary period.  (Doc. 40 at Ex. E at 80).

Neither Lt. Carden, Sgt. Garrett, nor Lt. Moore wrote Peoples up or received complaints about him after he completed training.  AF No. 48.3.  There were no complaints about an inability to understand Peoples on the radio and he was never removed from the radio.  AF No. 48.4.

Peoples is now a trainer for PSD IIs.  AF No. 48.5.  Peoples is also assigned to the Sheriff's Department's "special details" unit, which involves work reserved for the more proficient PSD IIs.  AF No. 48.6.[10]

Gary Robb ("Robb") has over twenty  years of experience as a dispatcher,  is one of the best PSD IIs on NCIC, and trains new hire PSD IIs on NCIC.  AF No. 49.1. Lt. Carden received complaints that Robb was hard to understand on the radio.  AF No. 49.2.  Sgt. Garrett pulled Robb off the radio and assigned him to the NCIC station.  AF No. 49.3.

A fitness of duty review revealed that Robb's issues were medically related. AF No. 49.4.  Robb's medication was reassessed and he was returned to duty to work

_____

[10] While Daniels provides a one sentence general response to paragraph 48, she does not dispute with evidentiary citations any of these facts offered by Hale in the paragraph.  (Doc. 42 at 5 ¶ 48).

all three PSD II functions.  AF No. 49.4.[11]

Chief Atkinson, Lt. Moore, Lt. Carden, Sgt. Garrett, and Taylor did not know that Daniels filed an EEOC charge of discrimination and a lawsuit against the Sheriff's Department prior to commencing her employment with the Sheriff's Department in 2005.  AF No. 50.1.  Maske heard that Daniels had previously filed a suit but was unaware of its substance.  AF No. 50.2.  Lt. Moore was not identified by Daniels in her 2002 lawsuit against then Jefferson County Sheriff, James Woodward. AF No. 51.

Daniels was not ever told that she was discharged because of her race or in retaliation for filing a prior EEOC charge of discrimination and lawsuit against the Sheriff's Department.  AF No. 52.1.  Daniels was not fired because she took sick leave and was never told anything to that effect.  AF No. 52.2.

## IV.   ANALYSIS

### A.   Procedural Motion for Summary Judgment

Hale seeks a complete dismissal of Daniels's case on judicial estoppel grounds. (Doc. 32 at 21 ("Accordingly, Daniels' [sic] Claims fail as a matter of law, and the Sheriff is entitled to a judgment as a matter of law.")).  However, in presenting his

---

[11] While Daniels provides a one sentence general response to paragraph 49, she does not dispute with evidentiary citations any of these facts offered by Hale in the paragraph.  (Doc. 42 at 5 ¶ 49).

motion, the Sheriff ignores clear controlling case law which recognizes that any claims for injunctive relief that would not have an impact on a plaintiff/debtor's estate are not barred by this doctrine.  *See, e.g., Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1289 (11th Cir. 2002) ("We decide, then, that the important and necessary reasons that bar Billups' [sic] monetary claims do not affect his efforts to change, through injunctive relief, Pemco's employment practices.  He may pursue his claims for injunctive relief."); *Barger v. City of Cartersville*, 348 F.3d 1289, 1297 (11th Cir. 2003) ("Barger's claim for injunctive relief (*i.e.*, her request for reinstatement) would have added nothing of value to the bankruptcy estate even if she properly disclosed it. Therefore, like the plaintiff-appellant in *Burnes*, <u>judicial estoppel does not prohibit Barger from pursuing any claims for injunctive relief that she may have</u>.") (emphasis added).

Similar to *Burnes* and *Barger*, Daniels is also pursuing non-monetary injunctive relief in this case, including seeking "a permanent injunction enjoining the defendant, its agents, successors, employees, attorneys and those acting in concert with the defendant and at the defendant's request from continuing to violate" Title VII, § 1981, and the FMLA.  (Doc. 20 at 6 ¶ 2).  Daniels additionally seeks to be made "whole by awarding her the position she would have occupied in the absence of race discrimination and retaliation[.]"  (*Id.* at 6-7 ¶ 4).  However, the court

concludes that judicial estoppel does apply to Daniels's monetary claims under Title VII[12] and, as a result, Hale's procedural Motion for Summary Judgment is due to be granted as to such monetary claims. In reaching this determination, this court is guided by the Eleventh Circuit's decision in *De Leon v. Comcar Indus., Inc.*, 321 F.3d 1289, 1291 (11th Cir. 2003), which held "that the rule established in *Burnes*, that judicial estoppel bars a plaintiff from asserting claims previously undisclosed to the bankruptcy court [involving a Chapter 13 petition subsequently converted into a Chapter 7 case] where the plaintiff both knew about the undisclosed claims and had a motive to conceal them from the bankruptcy court, <u>applies equally in Chapter 13 bankruptcy cases</u>."

The Eleventh Circuit reasoned why judicial estoppel should apply to the plaintiff/debtor in *De Leon*:

> De Leon also argues that his effort to reopen his bankruptcy estate is evidence that his omission was inadvertent. *But see Burnes*, 291 F.3d at 1287 (explaining that "'the debtor's failure to satisfy its statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment'") (quoting *In re Coastal Plains, Inc.*, 179 F.3d 197, 210 (5th Cir. 1999)). While Chapter 13 does allow amendments to be made to add after-acquired assets and Chapter 7 does not, De Leon did not make such an amendment even after he filed suit. Despite De Leon's

---

[12] As noted in the introduction and procedural history section, the court has already dismissed any monetary damages sought under both § 1981 and the FMLA on Eleventh Amendment immunity grounds.

continuing duty to disclose all assets or potential assets to the bankruptcy court, he did not amend his bankruptcy documents to add a potential employment discrimination claim until after Comcar relied on it in its motion to dismiss the case.

> The success of our bankruptcy laws requires a debtor's full honest disclosure.  Allowing [plaintiff] to back-up, re-open the bankruptcy case, and amend his bankruptcy filings, only after his omission has been challenged by an adversary, suggests that a debtor should consider disclosing potential assets only if he is caught concealing them.

*Burnes*, 291 F.3d at 1288.

> Because De Leon certainly knew about his claim and possessed a motive to conceal it because his amount of repayment would be less, we can infer from the record his intent "to make a mockery of the judicial system." *Id.* at 1285-87.  In conclusion, because the district court did not err in applying judicial estoppel to De Leon's retaliation and discrimination claims, we affirm its grant of summary judgment to Comcar.

321 F.3d at 1291-92 (emphasis added).

Here, there is no dispute over Daniels's awareness of her EEOC charge and the pursuit of her Federal Claims in this court, but she has never amended her bankruptcy filings to reflect these claims in the 2006 Bankruptcy Action even after Hale's defensive motion was filed.  Instead, Daniels's amended bankruptcy filings relate solely to the disclosure of the separate and independent challenge of Hale's discharge of Daniels under Personnel Board rules as litigated in state court and any potential

23

settlement of that particular lawsuit.[13]   Accordingly, because Daniels: (1) knew about her Federal Claims; (2) "possessed a motive to conceal [them] because [her] amount of repayment would be less[;]" and (3) continued in her failure to amend her 2006 Bankruptcy Action to list these Federal Claims, even after Hale had filed his motion and despite her having prior knowledge of the amendment process with respect to the appeal of her dismissal by Hale to the Personnel Board,[14] this court can infer from the record Daniels's intent "to make a mockery of the judicial system."   *De Leon*, 321 F.3d at 1292 (internal quotations and citation omitted).

-------

[13] As explained by Daniels regarding the procedural history of the state court case, "[a]lthough the hearing officer initially found in favor of the Sheriff's Department this finding was overturned by the Personnel Board, a reversal which was upheld by a three-judge panel."  (Doc. 42 at 12 ¶ 52.1; *see also* Doc. 41 at Ex. 7). Daniels also notes that "[t]his finding is currently on appeal to the Alabama Court of Civil Appeals."  (Doc. 42 at 12 ¶ 52.2).

[14] This court is not persuaded by Daniels's counsel's speculative argument that "a fair reading of the term lawsuit would indicate that the plaintiff was talking about her potential federal claim," especially in the absence of any affirmative evidence that this is what Daniels personally believed and/or any supporting case authority.  (Doc. 35 at 10 n.1; *see also id.* n.2).  Moreover, the applicable bankruptcy form expressly draws a distinction between "COURT" matters (*i.e.*, any lawsuits initiated) or "AGENCY" ones (*i.e.*, any administrative proceedings instigated).  Furthermore, by the time that Daniels had filed her amended bankruptcy papers (*i.e.*, on February 7, 2007), she had nearly one full year earlier filed (*i.e.*, on March 28, 2006) her EEOC charge relating to her potential Federal Claims, but affirmatively and inconsistently represented to the bankruptcy court in the amended Statement that no pending agency administrative action with the EEOC existed.  (Doc. 32 at Ex. F at 2 ("<u>not yet filed</u>") (emphasis added)).

Therefore, summary judgment in favor of Hale is appropriate with respect Daniels's Title VII monetary claims on the grounds of judicial estoppel, but inappropriate as to her non-monetary injunctive relief ones. The court now turns to an evaluation of the merits-based motion filed by Hale.

**B.    Merits-Based Motion for Summary Judgment**

Hale's initial brief on summary judgment is limited to *prima facie* challenges of Daniels's race and retaliation claims. (*See generally* Doc. 40). In particular, Hale does not set forth any legitimate, articulated reasons for firing Daniels in the event that she has satisfied her *prima facie* case as to either claim. (*Id.*). Instead, it is Daniels who identifies what she believes Hale's articulated explanation might be for her dismissal. (*See* Doc. 42 at 20 (referring to grounds set forth in Lt. Moore's memo recommending the termination of Daniels's employment)).

Similarly, Hale's reply brief is lacking regarding any helpful discussion of pretext. While the term "pretext" is vaguely mentioned "to the extent Daniels attempts to allege discrimination based on her violation of a work rule" (Doc. 43 at 15), once again Hale does not specify his legitimate explanations for dismissing Daniels. As Hale recognizes under the *McDonnell Douglas* framework, this is his burden if Daniels's *prima facie* case as to either race or retaliation is sufficient. (Doc. 40 at 14 ("If the plaintiff meets her burden and establishes a *prima facie* case of racial

25

discrimination, the defendant must 'articulate some legitimate, nondiscriminatory reason' for her termination.") (citation omitted)).

"There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citation omitted). Instead, "the onus is upon the parties to formulate arguments[.]" *Dunmar*, 43 F.3d at 599 (citation omitted). Therefore, because Hale has not carried his burden in moving for summary judgment on the alternative basis of articulating his legitimate explanation for his treatment of her and adequately presenting the position that Daniels is unable to show any pretext regarding these reasons, the court limits its analysis to the merits of Hale's properly developed attack on Daniels's *prima facie* case.

Additionally, regarding Daniels's simultaneous pursuit of race discrimination and retaliation under § 1981 by and through § 1983 in addition to Title VII, regardless of the legal vehicle relied upon, the court analyzes the merits of her claims under the same framework. *See Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1314 n.6 (11th Cir. 2000) (explaining parallel treatment in analyzing discrimination claims by state actors and citing several controlling cases); *see also CBOCS West, Inc. v. Humphries*, __ U.S. __, 128 S. Ct. 1951, 1960 (2008) ("Third, CBOCS points

26

out that § 1981, if applied to employment-related retaliation actions, would overlap with Title VII.  This argument, however, proves too much.  Precisely the same kind of Title VII/§ 1981 'overlap' and potential circumvention exists in respect to employment-related direct discrimination.").

Moreover, neither side takes the position that the court should treat the elements to those particular claims at issue here differently.  *See Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1120 n.10 (11th Cir. 2001) ("We have previously noted that whether the elements of Title VII and § 1981 retaliation claims are the same is an 'open question' in this Circuit.  *See Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1463 n.4 (11th Cir. 1998).  However, the parties have not raised or argued that issue before us, so we will not attempt to decide it now.  If the issue is raised and preserved on remand and survives the jury trial, it can be addressed in any subsequent appeal.") (emphasis added), *abrogated on other grounds as recognized by Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008) ("Thus, the *Burlington* Court effectively rejected the standards applied by this court in both *Stavropoulos* and *Gupta* [and *Bass*] that required an employee to show either an ultimate employment decision or substantial employment action to establish an adverse employment action for the purpose of a Title VII retaliation claim." (footnote and citations omitted); *see generally Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d

1405 (11th Cir. 1998).

### 1.    Race Discrimination

Regarding a circumstantial case of discriminatory discharge, the Eleventh Circuit has "consistently held that a plaintiff fired for misconduct makes out a *prima facie* case . . . if [s]he shows[:]"

> [T]hat [s]he is a member of a protected class, that [s]he was qualified for the job from which he was fired, and "that the misconduct for which [s][he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained".

*Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984) (citations omitted).

Here, the parties' *prima facie* dispute lies with (1) whether Daniels was qualified for the position from which she was terminated; and (2) whether the two white comparators (*i.e.*, Peoples and Robb) upon which she relies are similarly situated to her.

### a.    Qualification Prong

Turning to the qualification prong, as the Eleventh Circuit has explained in a discrimination case arising under the Age Discrimination in Employment Act ("ADEA"):

> [O]ur court focuses on a plaintiff's "skills and background to determine if they [sic] were qualified for a particular position." *Clark v. Coats &*

> *Clark*, 990 F.2d 1217, 1227 (11th Cir.1993). Our precedent holds that
> if a plaintiff has <u>enjoyed a long tenure at a certain position, we can infer</u>
> <u>that he or she is qualified to hold that particular position</u>. *See id.*
> (inferring a plaintiff's job qualifications from his 25 years of
> experience); *Pace v. Southern Railway System*, 701 F.2d 1383, 1386 n.
> 7 (11th Cir.1983) (finding that "where a plaintiff has held a position for
> a significant period of time, qualification for that position, sufficient to
> satisfy a *prima facie* case, can be inferred"). Based on the employment
> history of Damon and Kanafani, we can infer that they were qualified for
> their respective positions. Appellants were store managers <u>for more</u>
> <u>than a decade</u>, and, by all accounts, <u>had performed their jobs with</u>
> <u>distinction</u> during the bulk of that period. Damon held the position of
> store manager for 34 years, and consistently received numerous awards,
> commendations, and merit raises. Kanafani was a store manager for 13
> years, and also received his share of bonus awards and merit raises.

*Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1360 (11th Cir.

1999) (emphasis added); (*see also* Doc. 43 at 11). Unlike the plaintiffs in the *Damon*

case, Daniels had not held the position of PSD II for a long time; instead she "held

her position for approximately four (4) months, resigned, and then returned to work

for another six (6) or seven (7) months." (Doc. 43 at 11).

As further evidence of her probationary status, the Personnel Board, in

rejecting her request to transfer back to the JCDH as a medical clerk, noted that

Daniels did "not qualify for a lateral transfer because [of her lack of] permanent status

as a Public Safety Dispatcher." (Doc. 40 at Ex. A (part 5) at Ex. 27 at HALE 00018);

(*see also* Doc. 41 at Ex. 6 ("<u>Due to your probationary status</u>, I am unaware of any

appeal of this action under this system.") (emphasis added); *id.* at Ex. 4 ("I was also

informed that <u>since Ms. Daniels is still on probation with us</u>, she cannot transfer back to her old position at the Health Department.") (emphasis added)).   Therefore, Daniels's relatively short and interrupted time in tenure (*i.e.*, less than a full year even when considering her intermittent months of service collectively) as a dispatcher means that the inference of qualification rule does not apply to her.

Relatedly, in absence of any qualification inference, there is no prohibition against this court's consideration of Hale's problems with Daniels's performance at the *prima facie* stage.  *Damon*, 196 F.3d at 1360 ("We also have unambiguously held that allegations of poor performance <u>against plaintiffs discharged from long-held positions</u> may be properly considered, only *after* a *prima facie* case has been established, when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination.") (emphasis by underlining added) (citations omitted); *id.* ("We have explained that the reason for this modification [of *McDonnell Douglas*'s qualification prong] is that in cases <u>where a plaintiff has held a position for a significant period of time</u>, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred.") (emphasis added) (internal quotations and citations omitted).

Nor does the evidence that the Personnel Board deemed Daniels to be qualified for the PSD II position when she was initially hired satisfy her *prima facie* burden

under the qualification prong.  Instead, "[t]o demonstrate that she was qualified, [Daniels] must produce evidence which shows that she was meeting [Hale]'s legitimate performance expectations <u>at the time of her discharge</u>.  *See Ferrell v. Masland Carpets, Inc.*, 97 F. Supp. 2d 1114, 1124 (S.D. Ala. 2000) (citing *Thomas v. Eastman Kodak*, 183 F.3d 38, 56 (1st Cir. 1999) (noting that plaintiff must show that she has "met [the employer's] legitimate performance expectations"); (*see also* Doc. 43 at 12).  As the Eleventh Circuit has similarly recognized, "[a]n individual is 'qualified' for a position, for purposes of employment discrimination law, if he meets the criteria that the employer has specified for the position."  *Wright v. Southland Corp.*, 187 F.3d 1287, 1300 n.16 (11th Cir. 1999) (citation omitted).[15]

As Lt. Moore's memo recommending the termination of Daniels's employment as a dispatcher delineates, Daniels "only performs the duty of call taker and continues to make errors when assigning codes to calls."  (Doc. 41 at Ex. 4).  Daniels does not deny that she was only serving the call-taker functions at the time of her discharge.  Moreover, she has admitted that working as a call-taker only on a permanent or indefinite basis would not be acceptable for the position of a PSD II.  AF No. 16.3.

---

[15] The *Wright* court also discussed the two methods of proof for establishing an individual disparate treatment case:  "As our cases have made clear, where a plaintiff cannot establish the *McDonnell Douglas* presumption, <u>his only other option is to present direct evidence of discrimination</u>."  187 F.3d at 1301 (emphasis added).

31

This evidence substantiates the Sheriff's contention that Daniels was not meeting her employer's reasonable job expectations for the position of dispatcher at the time of her separation, and Daniels has not shown otherwise.

Moreover, regarding additional performance deficiencies observed and reported by a variety of other witnesses, Daniels's primary response is that she was only ever informed about her inability to speak up (*see, e.g.*, Doc. 40 at Ex. A (part 1) at 194; Doc. 42 at 2-3 ¶ 26); she does not meet head on the issue of her perceived performance problems, but rather complains that she was not made aware of them so that she could (possibly) correct them through additional training.[16]  At other times, however, she admits that her performance problems were a matter of discussion, for example prior to when she tendered her resignation.  AF Nos. 36.1-36.2.  Regardless, Daniels has not shown how she was or even how she  could (with additional training) meet her employer's reasonable performance expectations for a PSD II.

Further, Daniels's own favorable opinions about her job performance as well as those of lower level personnel do not meet her burden either.  *Ferrell*, 97 F. Supp. 2d at 1124 (citations omitted); *see also Cooper v. Southern Co.*, 390 F.3d 695, 743

---

[16]  Daniels admits that she received some basic dispatcher training when she began working for the Sheriff's Department (Doc. 40 at Ex. A (part 1) at 162); her complaint is really about the refusal of Hale to provide her with any additional training.

(11th Cir. 2004) ("However, McCullers's <u>personal opinion</u> that being ranked as a four meant she exceeded expectations <u>is insufficient to establish her qualification</u>.") (emphasis added) (citation omitted), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006); *Gamble v. Aramark Uniform Services*, 132 Fed. Appx. 263, 266 (11th Cir. 2005) ("[A]t least one other circuit has noted that co-worker opinions are 'close to irrelevant' in Title VII claims. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) ('[I]t is the perception of the decision maker which is relevant. . . . The alleged opinions of . . . co-workers as to the quality of [plaintiff's] work are . . . close to irrelevant.') (internal quotations and citations omitted).").  Accordingly for all these reasons, Daniels's *prima facie* case fails as to the qualification prong.

### b.   Similarly Situated Prong

"As part of the Title VII plaintiff's *prima facie* case, the plaintiff must show that h[er] employer treated similarly situated employees outside h[er] classification more favorably than herself." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (citation omitted).  "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that [s]he and the employees are <u>similarly situated in all relevant respects</u>." *Id.* (emphasis added) (citations omitted).

In her opposition brief, Daniels identifies Robb and Peoples as her potential

33

comparators. (Doc. 42 at 18-19). As for Daniels's specific comparator evidence, Robb's situation is entirely different than hers. More particularly, it is undisputed that Robb suffered from a temporary medical problem that negatively affected his performance. However, once this medical issue was corrected, Robb no longer had any performance deficiencies in the position and was able to fulfill all dispatcher functions. Daniels has no evidence to show that her performance problems were similarly medically-related and that they could have been resolved by some type of accommodation by Hale, but instead were not implemented because of her race or because of her prior lawsuit against the Sheriff's Department. Accordingly, Robb is not a suitable comparator.

Peoples, at first glance, may appear to be a closer call, but he, too, is not an appropriate comparator. While Peoples's performance as to inputting information was slow initially, Daniels admits that he always adequately performed the tasks associated with dispatching. AF No. 48.1. Further, later Peoples was able to perform at a more proficient level and now trains other dispatchers.

Moreover, unlike Daniels, Peoples never received any write-ups or complaints about his performance after he completed training. Also, unlike Daniels, no one ever complained about an inability to understand Peoples on the radio and he was never removed from the radio. AF No. 48.4.

Further, regarding the APCO training that Peoples attended and Daniels did not, the two are not similarly situated, because while Daniels was scheduled for the training, subsequently she tendered her resignation which meant she would have been attending training for a position that she no longer desired to hold.  AF No. 18.2; (Doc. 40 at Ex. A (part 1) at 198-99 (Daniels's testifying that she was "unhappy with" "a lot of different things" including the "environment and some of the training [she] had received" at the Sheriff's Department as compared to when she was working at the JCDH)).  Daniels does not point to any other training that Peoples received which she was denied.  Therefore, Peoples is neither similarly situated to Daniels nor did he receive more favorable treatment than she.  Accordingly, Daniels's *prima facie* case fails for the additional reason that she cannot point to a similarly situated employee, outside of her protected class, who received better treatment than she did.

## 2.    Retaliation

In *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006), the Supreme Court held regarding retaliation under Title VII:

> We conclude that the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace.  We also conclude that the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant.  In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or

supporting a charge of discrimination.

*Id.*, 548 U.S. at 57.  Prior case law in the Eleventh Circuit limited the foundation of retaliation claims to treatment amounting to adverse employment actions. Accordingly, the *prima facie* elements for retaliation under Title VII pre-*Burlington Northern* were proof of: "(1) statutorily protected expression; (2) . . . an adverse employment action; and (3) . . . a causal connection between the two events." *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).

The Eleventh Circuit has explained the impact of *Burlington Northern* on the second *prima facie* element to a Title VII retaliation claim as:

> [T]he Supreme Court has defined an adverse employment action in the context of a retaliation claim as an action by an employer that is harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination.

*Wallace v. Georgia Dept. of Transp.*, 212 Fed. Appx. 799, 802 (11th Cir. 2006) (citation omitted).  Accordingly, as reformulated post-*Burlington Northern*, "'[t]o establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events.'" *Butler v. Alabama Dept. of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008) (citations omitted).

36

As the Eleventh Circuit described protected activity in *E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171 (11th Cir. 2000):

> Title VII's retaliation provisions do protect certain kinds of activity. Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3 (a). And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.* . . .
>
> The participation clause covers participation in "an investigation . . . under this subchapter," that is, an investigation under subchapter VI of Chapter 21 of Title 42 (42 U.S.C. §§ 2000e- 2000e-17). 42 U.S.C. § 2000e-3(a). This clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC. *See Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978) (stating that participation means "participation in the machinery set up by Title VII to enforce its provisions"). We conclude that, because no EEOC complaint had been filed before Warren's termination, her taking part in Defendant's internal investigation did not constitute protected expression under the participation clause of Title VII.

*Total System*, 221 F.3d at 1174 (footnotes omitted).

Here, Daniels relies upon the participation clause in support of her retaliation claim. More specifically, Daniels "engaged in protected activity when she filed and litigated a [prior] lawsuit against the Sheriff's Department which concluded with a settlement in September 2004." (Doc. 42 at 26). Daniels initiated her pregnancy

37

discrimination lawsuit against former Sheriff James Woodward on November 21, 2002. (*See* Doc. 1 in 2:02-CV-2851-LSC). The materially adverse action about which Daniels complains is her dismissal effective November 25, 2005. The critical question as to her retaliation claim is whether Daniels has put forward proof to support the causation element of that claim.

### a.   Lack of Temporal Proximity

The time elapse between the September 2004 settlement and separation effective November 25, 2005, is over eleven months.[17] Of course, the period between

———————————

[17] The court notes that, while Daniels expressly states that her protected activity is her prior lawsuit and related settlement occurring in September 2004, she subsequently mentions in her causation connection section that her "complaint to Fagan and Becton occurred three to four months prior to her termination, which is sufficient to establish a causal connection." (Doc. 42 at 27). However, Daniels has not shown the substance of any complaint to Fagan and Becton or how it constitutes protected activity under Title VII. In fact, the court does see where in her brief Daniels has even explained exactly who Fagan and Becton are.

Moreover, immediately after referencing the complaint to Fagan and Becton, Daniels reiterates that "[t]he <u>triggering event</u> for the plaintiff's retaliation claim <u>is the settling of her lawsuit</u> in September 2004[.]" (Doc. 42 at 27-28 (emphasis added)). Therefore, the appropriate starting point for measuring time relative to Daniels's retaliation claim is September 2004 and not the later point in which Daniels may have lodged some type of internal complaint.

Finally, assuming that the Fagan/Becton complaint is appropriately classified as a protected activity under Title VII, then, under this alternative scenario, the time elapse is still three to four months, which without more, this court concludes is insufficient as a matter of law to establish a causal connection. *See, e.g., Clark*, 532 U.S. at 273-74 (citing with approval "*Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209

the filing of her first lawsuit against the Sheriff's Department and her dismissal is even longer (*i.e.*, over three years). "[I]n the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (citations omitted).

As the Eleventh Circuit has explained the causal connection *prima facie* element:

> We have noted that the Supreme Court in a Title VII retaliation case has stated that in order to show a causal connection "mere temporal proximity between knowledge of protected activity and an adverse action must be 'very close.'" *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (involving alleged retaliation under the ADA) (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001) (alterations omitted)). Moreover, we have observed that the Supreme Court has cited with approval decisions in which a three to four month disparity was found to be insufficient to show causal connection. *Id.* We concluded that "[i]f there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Id.*

*Wallace*, 212 Fed. Appx. at 802. A period of over eleven months is not only not "very close," but also is substantially far from "very close." *See Thomas*, 506 F.3d at 1364 ("That three (3) month period, without more, does not rise to the level of

_____

(C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) (4-month period insufficient).") (emphasis added).

39

'very close.'") (citing *Clark*, 532 U.S. at 273).

Moreover, the gap of over eleven months is in excess of other examples of time periods which the Eleventh Circuit has rejected as a matter of law as establishing, in the absence of any other supporting evidence, a causal connection. *See, e.g.*, *Watkins v. Huntsville, Ala.*, 176 Fed. Appx. 955, 956-57 (11th Cir. 2006) (affirming summary judgment on plaintiff's retaliation claim because eight month lapse between filing of EEOC charge and her termination does not support causal link and plaintiff could not show nexus otherwise); *Hammons v. George C. Wallace State Comm. Coll.*, 174 Fed. Appx. 459, 464 (11th Cir. 2006) (affirming summary judgment on plaintiff's retaliation claim because letter of grievance written to chancellor five months before termination is not sufficient temporal proximity to establish causal element of *prima facie* case); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1245 (11th Cir. 2001) (three and one-half months of temporal proximity, without more, is insufficient to create jury issue); *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 951 (11th Cir. 2000) (holding that seven month time period between protected activity and adverse employment action is too indirect to satisfy causal connection requirement); *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1160-61 (11th Cir. 1999) (finding no causal link between protected activity in February 1994 and adverse employment actions in late 1994 and early 1995). Therefore, Daniels's retaliation claim fails due

40

to a lack of sufficient temporal proximity.

### b.     Lack of Decision-Maker Knowledge

Hale also defends against causation on the grounds that no one involved in the decision to terminate Daniels's employment had knowledge of her prior protected conduct.  Daniels responds that "a question of fact definitely exists as to Lt. Moore's knowledge" because Lt. Moore "was listed as a 'will call' witness on behalf of the Sheriff's Department in Daniels's earlier suit . . . filed in August 2004."  (Doc. 42 at 29).  Because the court finds that Daniels's retaliation claim is otherwise deficient on a *prima facie* basis due to the significant passage of time between any protected activity ("triggering" or otherwise) and her separation, it does not need to reach the issue of whether Lt. Moore's inclusion on the witness list constitutes sufficient, admissible proof that persons involved in the decision to discharge Daniels had the requisite prior knowledge of her protected activity in advance of the decision to fire her.

Alternatively, assuming that such trial materials created by counsel for the Sheriff's Department in August 2004 (*see* Doc. 41 at Ex. 10) would be potentially admissible to show Lt. Moore's requisite knowledge, the fact that Daniels has admitted that Lt. Moore did not know that Daniels had filed an EEOC charge of discrimination and a lawsuit against the Sheriff's Department prior to commencing

her employment with the Sheriff's Department in 2005 (AF No. 50), negates any such type of inference that could be drawn from her inclusion on the 2004 witness list. Similarly, this conclusion of an impermissible inference is bolstered by the fact that Daniels did not ever identify Lt. Moore as a pertinent witness in her prior lawsuit against the Sheriff's Department.  AF No. 51.

Further, Daniels has not affirmatively shown evidence of Lt. Moore's knowledge of her prior lawsuit against the Sheriff's Department, much less her understanding of its nature and scope, through any other competent evidence.  Proof of a decision-maker's awareness of the protected activity is undoubtedly Daniels's burden to bear.  "To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct, and that protected activity and the adverse actions were not wholly unrelated."  *Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (emphasis added) (quotation omitted).  Moreover, "neither a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge." *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1156 (11th Cir.2002); (*see also* Doc. 40 at  23). Therefore, summary judgment in favor of Hale is also appropriate on the additional ground that Daniels has failed to show the requisite knowledge of her protected actions on the part of Lt. Moore or any other participants in the decision-making

42

process.

### 3.   FMLA

As stated above, only Daniels's claims for injunctive relief remain under the FMLA.  Hale has moved for summary judgment on the still pending portion of Daniels's FMLA count on the basis that she was not an "eligible employee" entitled to the statute's protection and that, regardless, insufficient evidence exists that she suffered from any retaliation.  (*See generally* Doc. 40 at 24-28)

In her opposition brief, Daniels has made no arguments about any claims for injunctive relief relating to the FMLA.  Instead, Daniels merely states:

> The plaintiff's FMLA claim, although addressed in the defendant's brief, was already dismissed by this Court upon motion of the defendant based upon immunity reasons.  Plaintiff will not address a claim which has already been dismissed.

(Doc. 42 at 29).

Accordingly, to the extent Daniels was actually pursuing injunctive relief with respect to the FMLA, that portion of her complaint has been abandoned and is due to be dismissed on summary judgment for her failure to offer any opposition. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller International, Inc.*, 998 F. Supp. 1473, 1477 (N.D. Ga.

1998) (finding unaddressed claim abandoned); *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *Dunmar,* 43 F.3d at 599 (explaining that district court is not obligated to address all potential arguments on summary judgment that could be made) (citation omitted); *Dunmar*, 43 F.3d at 599 ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citations omitted) (emphasis added); *Hudson v. Norfolk Southern Ry. Co.,* 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001); *cf. McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (concluding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").

Alternatively, Hale is substantively correct that Daniels does not qualify as an "eligible employee" under the FMLA.  More specifically, she has not shown that she was "an employee who had been employed (i) for at least 12 months by the employer with respect to whom leave is requested under § 2612 of this title; and (ii) and for at

least 1250 hours of service with such employer during the previous 12-month period." *See* 29 U.S.C. § 2611(2)(A).  Accordingly, summary judgment as to the remaining injunctive part of Daniels's FMLA count is additionally appropriate due to Daniels's unprotected status under the FMLA.[18]

## V.   CONCLUSION

For the reasons set forth above, Hale's Motion for Summary Judgment based upon procedural grounds is due to be denied as to Daniels's claims for any non-monetary injunctive relief, but granted as to Daniels's remaining monetary-based claims under Title VII.  Further, Hale's merits-based Motion for Summary Judgment is due to be granted.  The court will enter an order consistent with this memorandum opinion.

**DONE** and **ORDERED** this the 22nd day of January, 2009.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

---

[18]  The court does not reach any assessment of Hale's second substantive ground, relating to insufficient proof of retaliation, alternatively offered in support of summary judgment under the FMLA.